Western United Life Company (Formerly Western Union Life Company) v. Commissioner. National Mutual Benefit Association (Transferee) v. Commissioner.
Western United Life Co. v. Commissioner
Docket Nos. 108674, 110011, 108675, 110012.
United States Tax Court
1943 Tax Ct. Memo LEXIS 160; 2 T.C.M. (CCH) 576; T.C.M. (RIA) 43376; August 6, 1943
*160 Joseph K. Moyer, Esq., 1343 H St., N.W., Washington, D.C., for the petitioners. Donald P. Moyers, Esq., for the respondent. ARNOLD Memorandum Findings of Fact and Opinion ARNOLD, Judge: These proceedings, consolidated for hearing and report, involve income tax deficiencies and penalties determined against Western United Life Company as the taxpayer and against National Mutual Benefit Association as transferee. The petitioners will for convenience hereinafter be referred to as though the taxpayer was the only party before us since transferee liability is admitted to the extent of any additional tax and penalty determined to be due. The deficiencies, penalties, and years involved are as follows: Year
Deficiency
Penalty
1935
$ 97.94
$ 24.49
1936
175.37
43.84
1937
3,054.74
763.69
1938
1,458.63
The principal issued is whether petitioner is a life insurance company within the meaning of section 201 (a) of the Revenue Acts of 1934, 1936 and 1938. If not a life insurance company the following additional issues are involved: (1) whether petitioner is entitled to deduct $22,727.08 and $14,073.79 for 1937 and 1938, respectively, as compensation paid to its general agents, *161 or $6,272.17 and $7,618.72, respectively, as allowed by the respondent; and (2) whether petitioner is subject to a delinquency penalty of 25 percent for the years 1935, 1936 and 1937. Findings of Fact Western United Life Company was incorporated without capital stock under the laws of the State of Texas in 1910 under the name of "Yeoman." In 1933 the name of the company was duly changed to "Texas Central Life Association." In 1934 the name was again changed to "Western Union Life Company." On April 11, 1939, its name was changed to "Western United Life Company." Petitioner's income tax returns were filed with the collector of internal revenue for the first district of Texas. Petitioner is a statewide mutual assessment association engaged in writing life insurance contracts. It was required to and filed annual statements with the Commissioner of Insurance for the State of Texas who had supervision of matters relating to life insurance. For each of the years involved herein the Board of Insurance Commissioners of the State of Texas issued a certificate to petitioner authorizing it, or its predecessor, "to pursue the business of LIFE insurance" within the State of Texas. Petitioner *162 issued policies of life insurance under which monthly premiums were required to be paid. Petitioner had the right to demand and collect from policyholders additional amounts known as assessments to protect the policy contracts. There was no limitation upon the number of assessments that might be made in any year. The words "premiums" and "assessments" are used in the policies and by-laws interchangeably. In each of the years 1937 and 1938 the petitioner levied one extra assessment against its policyholders. Default in the payment of any premium or assessment voided a policy subject, however, to reinstatement. There was no provision in the policies or otherwise for the distribution of any dividends or rebates to policyholders. Only assessment policies were issued by petitioner. The policies were written without medical examination. The assessment or premium income of the petitioner was divided into two funds known as the Mortuary and General funds. The first three months' premium, known as membership fees, together with 40 percent of all premiums or assessment thereafter received were turned over to the General fund, and 60 percent of the premiums or assessments after the first three *163 months were placed in the Mortuary fund. Claims on policy contracts were paid out of the Mortuary fund either from an amount on hand or from amounts raised by special assessments. The liability of the petitioner was limited to the Mortuary portion (60%) of one assessment or premium payments from all policyholders at the time of the death of the insured in the group in which the policy was placed, thus any Mortuary fund on hand, but not to exceed the maximum benefits of the policy in accordance with its terms, limitations and conditions. Section 22A of petitioner's by-laws required "that at least fifty percent of the benefits, as required by law, due at the time of the death of the member shall be paid." Under date of February 8, 1934, the Board of Insurance Commissioners of Texas passed a ruling which has since been continuously in effect and which covered the operations of petitioner and like companies. The ruling provided that 60 percent of the premium income must be placed in the Mortuary fund of the company and not more than 40 percent could be placed in the general or expense fund, except that the first three months' payment where no membership was provided for might be placed *164 in the expense fund. Petitioner's bylaws contained no provision for a membership fee, but section 20 thereof provided that not less than 60 percent of the premium payments collected, except the first three months, "shall be paid into the Mortuary Fund for the payment of approved claims and other legal and proper expenses incident to the investigation, approval and settlement of said claims." In each of the years involved herein petitioner complied with the ruling of the Board of Insurance Commissioners. The laws of the State of Texas required petitioner to deposit with some bank or trust company in the State subject to the payment of its policy contracts a sum equal to the largest risk assumed on any one life or person. In 1935 and 1936 this deposit amounted to $2,000. In 1937 and 1938 this deposit amounted to $3,000. Petitioner did not invest the amounts placed in its Mortuary fund in incomebearing property but kept its funds in a liquid state to pay claims. Petitioner had no income from interest, dividends or rents. It built up no reserve over a period of years with which to mature or liquidate its policies. In some years the amount actually placed in the Mortuary fund was exceeded *165 by the amount paid therefrom. Petitioner provided no actuarially computed insurance reserve for its policies and none was required by laws of Texas or by the Texas Board of Insurance Commissioners. Petitioner's annual statements for the years 1935 to 1938, inclusive, filed with the Commissioner of Insurance for the State of Texas, were received in evidence as exhibits and are incorporated herein by reference. The annual statements allocate the income and disbursements by petitioner between the Mortuary and General funds, show that income consisted almost wholly of premiums and assessments received from applicants and members, and that the principal items of disbursement charged against the Mortuary fund were payments of death claims and expenses in connection with policy claims. Said annual statements show among the disbursements charged against the General fund for the years 1937 and 1938 the amounts of $22,727.08 and $14,073.79, respectively, paid to general agents. The annual statements show the balance in the Mortuary fund as an asset and unpaid claims as a liability. On or about March 10, 1934, petitioner, as party of the first part, entered into a "General Agency Contract" *166 with George H. Cottrill and Charles G. Eidson, as parties of the second part, whereby it was agreed as follows: 1. That the FIRST PARTY grants to the SECOND PARTIES the exclusive and sole General Agency Contract which carries with it the sole right to solicit Memberships and otherwise sell the life insurance under such terms and regulations as may be set forth from time to time by the Directors of the Company (PARTY OF THE FIRST PART). 2. The duration of this contract shall be for a period of twenty (20) years with an option at the expiration of this period to the SECOND PARTIES for a renewal for a like period under the same terms and conditions as set forth herein. 3. The SECOND PARTIES shall assume the general management and direction of all the business of every nature of the PARTY OF THE FIRST PART and to pay all expenses of every nature and kind incident to the operation of said business. 4. THE PARTIES OF THE SECOND PART hereby agree to devote their best efforts and attention to the management and direction of the business affairs of the PARTY OF THE FIRST PART. 5. The SECOND PARTIES, their heirs or executors, are hereby granted the right to sell, assign or otherwise dispose *167 of such interest in this contract as they may desire and at such time as they may elect. 6. The PARTY OF THE FIRST PART agrees to pay to the PARTIES OF THE SECOND PART the entire sum received from Initial Membership fees, Reinstatement Fees, Collection Fees and all sums for the Expense Fund as is now provided or may hereinafter be provided under the terms of the contracts as issued by the PARTY OF THE FIRST PART, and all other income of whatever kind and nature save and except the specified income which is set aside for the Mortality Fund, which is to be used for the payment of proper claims and the necessary expense incident to the investigation, approval and settlement of said claims. The above General Agency Contract is characteristic of the method used by a majority of companies like petitioner to compensate for services, where the particular services rendered are the same. On or about April 5, 1937, Cottrill and Eidson transferred the above General Agency Contract to E. J. Becker for the consideration therein stated. In 1937 and 1938 petitioner paid the following amounts to individuals in exchange for their services as general agents: in 1937 to Cottrill and Eidson, $12,196.20; *168 to Becker $10,530.88, total, $22,727.08; in 1938 to Cottrill and Eidson, $4,045.00, to Becker, $10,028.79, total, $14,073.79. After paying all expenses and costs of operation during 1937 and 1938, including the aforesaid payments to general agents, the General fund of the petitioner showed a balance for each of said years. Under the terms of the general agency contracts the general agents were entitled to these balances as well as the sums paid to them. After the assignment of the general agency contract to Becker on or about April 5, 1937, Cottrill and Eidson had no connection with and performed no services for petitioner during 1937 and 1938. The $4,045 paid to Cottrill and Eidson by petitioner in 1938 was income to Becker which was paid over in accordance with his directions. Cottrill and Eidson were also general agents for four or five other insurance companies of the same type as petitioner and drew compensation from them under their general agency contracts. No allocation of the time devoted to each company could be made as the general agents gave all their time to the companies collectively as to all questions of management and finance. Cottrill and Eidson employed sales *169 agents to solicit the insurance business for the companies that they managed and operated. Petitioner's income tax returns for 1935, 1936 and 1937 were filed July 13, 1939, on form 1120-L. The returns showed no income and no disbursements, but had inscribed on the face thereof the following statement: "This is an annuity assessment insurance company organized under the laws of the State of Texas. Its only source of income is from membership fees and assessments from which claims and expense of operations are paid." Petitioner's failure to file timely returns for said years was due to its belief that it was exempt and not required to file a return. In determining the deficiencies herein respondent computed gross income as the total income allocated to the Mortuary and General funds in the annual statements filed with the Commissioner of Insurance as hereinabove mentioned. He computed net income by deducting the total disbursements charged against said funds, except for repayments on loans and amounts disallowed as reasonable compensation to general agents in 1937 and 1938. For 1937 he further adjusted income and disbursements by a $114.50 discrepancy. Opinion The principal issue *170 involved herein is whether as a matter of law the petitioner is a life insurance company for income tax purposes. A comparison of the pertinent sections and provisions of the Revenue Acts of 1934, 1936 and 1938, which are involved herein, discloses that said sections and provisions are substantially the same. For the purposes of this report, therefore, we will consider the applicable provisions of the Revenue Act of 1936 as representative of the several acts. Section 201 of the 1936 Act provides for the tax on life insurance companies. Section 201 (a) defines a "life insurance company" as "an insurance company engaged in the business of issuing life insurance and annuity contracts (including contracts of combined life, health, and accident insurance), the reserve funds of which held for the fulfillment of such contracts comprise more than 50 per cent of its total reserve funds." Section 202 of said Act provides that "In the case of a life insurance company the term 'gross income' means the gross amount of income received during the taxable year from interest, dividends and rent." We have found as a fact that petitioner had no income from interest, dividends or rents, so that if *171 petitioner is a "life insurance company," as defined by section 201 (a), it will have no tax liability, since it had no gross income. Whether petitioner is a life insurance company as defined by the statute turns fundamentally upon whether petitioner's failure to maintain an actuarially computed reserve prevents it from being so classified. Respondent concedes that petitioner writes life insurance policies but asserts that failure to maintain an actuarially computed reserve is fatal to its claim of being a "life insurance company" as defined in section 201 (a). Respondent refers us to his briefs in , and Abilene Life Insurance Company, Memorandum Opinion, entered February 10, 1943, for a statement of the principles and authorities, which cases, he says, involve Texas companies and the same life insurance problem with which we are here concerned. While this Court agreed with respondent's arguments in the two cited cases and held that the reserves of those Texas companies failed to qualify them as life insurance companies within the applicable law, unfortunately for respondent the Circuit Court of Appeals *172 for the Fifth Circuit has recently reversed this Court in both cases, , and . We can find no basis on facts or principle for distinguishing this proceeding from the cited cases, and upon authority thereof we hold that petitioner is a life insurance company within the meaning of section 201 of the applicable Acts. This disposition of the principal issue makes it unnecessary to discuss the questions of deductions for compensation or penalties for delinquent filing of returns. Decisions will be entered for the petitioners.